(C.D. 2790)

PARKELL Co. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 17, 1966)

*John D. Rode* for the plaintiff.

*J. William Doolittle*, Acting Assistant Attorney General (*Shelia N. Ziff*, trial attorney), for the defendant.

Before RAO, FORD, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, consists of copper bands, aluminum shells, and aluminum crowns, imported from West Germany and entered at the port of New York in 1960 and 1961.[1] The articles were assessed with duty under paragraph 397 of the Tariff Act of 1930, as modified, the copper bands at 22½ per centum ad valorem under the modification by the General Agreement on Tariffs and Trade, T.D. 51802, as manufactures of copper, not specially provided for, and the aluminum shells and aluminum crowns at 19 per centum ad valorem under the modification by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as manufactures of aluminum, not specially provided for. It is claimed that all of the articles are dutiable at 17½ per centum ad valorem under paragraph 359 of said tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739 and T.D. 52820, as dental instruments.

The pertinent provisions of the tariff act, as modified, are as follows:
Paragraph 397, as modified by T.D. 51802, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:
> \* \* \* \* \* \* \*
> Composed wholly or in chief value of \* \* \* copper, \* \* \* but not plated with platinum, gold, or silver, or colored with gold lacquer:
>> \* \* \* \* \* \* \*
>> Other (except slide fasteners and parts thereof) _____ 22½% ad val.

Paragraph 397, as modified by T.D. 54108, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:
> \* \* \* \* \* \* \*
> Composed wholly or in chief value of \* \* \* aluminum, \* \* \* but not plated with platinum, gold, or silver or colored with gold lacquer:
>> \* \* \* \* \* \* \*
>> Not wholly or in chief value of tin or tin plate:
>>> \* \* \* \* \* \* \*
>>> Other, composed wholly or in chief value of \* \* \* aluminum (except \* \* \*). \* \* \* _____ 19% ad val.

---

[1] This case was tried and submitted in New York on December 15, 1964. Plaintiff's brief was filed on March 19, 1965, and defendant's brief on November 9, 1965.

Paragraph 359, as modified by T.D. 52739 and T.D. 52820, *supra:*

Dental instruments, and parts thereof, including hypo-
 dermic needles, hypodermic syringes, and forceps,
 wholly or in part of iron, steel, copper, brass, nickel,
 aluminum, or other metal, finished or unfinished, but
 not in chief value of glass:
 Burrs _____ 22½% ad val.
 Other _____ 17½% ad val.

Two witnesses were called at the trial: Mr. Alex Mitchell, president of Parkell Products, Inc., successor to the plaintiff company, with which he was also associated, and Dr. Morton Klein, a dentist who has been in practice since 1944.

Mr. Mitchell testified that the Parkell firms have been engaged in the importation and wholesale selling of dental instruments, such as tooth extraction forceps, dental pliers or bending wires, tweezers, and many other items. He was familiar with the merchandise involved herein and produced samples of the copper bands, aluminum shells, and aluminum crowns, which were marked plaintiff's collective exhibits 1, 2, and 3, respectively. They are sold as imported to dental supply dealers, dental universities, dental installations, and the Armed Forces. Mr. Mitchell had seen them used in dental offices in different parts of the country. Dr. Klein testified that he was also familiar with these items and had used them on thousands of occasions.

According to the witnesses, after a tooth is prepared for a crown, a copper band is trimmed to shape to fit over the tooth and is filled with wax and placed over the tooth to get an impression of it. This is used by technicians to make a duplicate of the tooth. The band acts as a carrier or instrument for the wax.

The aluminum shell is a cup shaped temporary capping for a tooth which is in preparation for a permanent crown. It is worn temporarily to hold a sedative dressing or cement inside so that the tooth does not become sensitive. It may be used 3 or 4 times on the same tooth during the course of work which may last as long as 6 or 7 months. It is removed when the final gold or porcelain is applied.

Aluminum crowns are used for the same purpose as shells but are formed more closely to resemble a tooth in shape. This reduces irritation of the gums and the tendency for food to become trapped between the crowned tooth and the one in front of it.

The bands, shells, and crowns are disposable and are ordinarily thrown away after they have served their purpose. Burrs are also thrown away after being used.

Dr. Klein has been familiar with the shells since his days in dental school, 1940–43, while the crowns are newer items he has known since 1954–56.

There is no evidence whether the items were known in 1930 and no reference to them has been found in the legislative history.

Mr. Mitchell said that not everything that goes to the dental trade is an instrument; that his catalog did not refer to anything specifically as an instrument, and that items were ordered by name, such as copper bands, forceps, etc. He regarded exhibits 1, 2, and 3 as tools, because they are used by dentists to perform their work. Dr. Klein said he did not use the nomenclature "instrument" to refer to these items but called them bands, crowns, or shells. In his opinion they fall within dictionary definitions of the term "instrument" which were read to him.

Defendant has conceded, in its brief, that the copper bands are properly dutiable under paragraph 359, *supra*, on the ground that the record established that they are used solely by dentists to obtain impressions for the preparation of dentures or artificial teeth. It is claimed, however, that the aluminum shells and aluminum crowns are not dental instruments.

As is common in cases tried before *United States* v. *C. S. Emery & Company*, 53 CCPA —, C.A.D. 868, the use testimony speaks in the present tense as of the time of trial, not the date of importation. But the irregularity is of no importance because manifestly the articles always had but one use.

Dictionaries have defined the term "instrument" as follows:

Webster's New International Dictionary (1953 edition):

instrument, *n.* 1. That by means of which any work is performed or result is effected; a medium; means. 2. A tool; utensil; implement.

Funk & Wagnalls New Standard Dictionary (1956 edition):

instrument, *n.* 1. A means by which work is done; an implement or tool, especially an implement or mechanism for scientific or professional purposes, as distinguished from a device, tool, or machine for industrial uses; * * *.

The Summary of Tariff Information, 1929, states (p. 769):

The term "dental instruments" as applied by the trade includes in addition to the well-known hand tools, engines, drills, and grinding wheels and disks, such items as operative steel instruments, chairs, teeth, and all sorts of equipment and supplies. * * *

Burrs, drills, and broaches used for drilling and other operations on teeth, because of the frequency of their use and the rapidity with which they wear out, are an important class of dental instrument.

At the hearings before congressional committees preceding the enactment of the Tariff Act of 1930, it was stated orally and in briefs that surgical and dental instruments should not be confused with other supplies needed by hospitals or dental clinics, such as furniture, chemi-

cals, gauzes, rubber goods, ligatures, X-rays, and dozens of other materials. Tariff Readjustment, 1929, Hearings before the Committee on Ways and Means, House of Representatives, Seventieth Congress, second session, volume III, schedule 3, pages 2241, 2242; Tariff Act of 1929, Hearings before the Committee on Finance, United States Senate, Seventy-First Congress, first session, volume III, schedule 3, pages 546, 551–552, 563–565. Specific articles mentioned as dental instruments were dental hypodermic needles, engine burs, cutting instruments, dental handpieces, broaches, pliers, tweezers, scissors. Hearings, Committee on Ways and Means, House of Representatives, op. cit., pages 2247–2248. In a brief presented to the Senate Committee on Finance by the Surgical and Dental Instrument Manufacturing Industry, it is stated that surgical and hospital supplies are not classified as surgical instruments under paragraph 359. Continuing, the brief states:

The same also applies to dental instruments, as it is estimated a dentist in the yearly expenditure of his office and operating room does not pay over one-quarter of 1 per cent of his entire annual expenditure for new instruments. His requirements, however, do call for amalgams, artificial teeth, dental equipment, dental cement, dental plaster, investment compounds, dental golds, anaesthetics, vulcanizers, dental rubbers, fusing porcelains, and many others; none of these are in any way related or subject to the tariff in paragraph 359 * * *. [Hearings, Senate Committee, op. cit. pp. 551–552.]

The specific items enumerated in paragraph 359, *supra*, while not excluding other articles, are an indication of what the Congress meant by "dental instruments." The portion quoted from the Summary of Tariff Information, 1929, *supra*, would seem to reflect a lapse from the usual high standard of that publication. The statement that "dental instruments" includes "all sorts of equipment and supplies" is contradicted by all usage elsewhere in the legislative history. Thus in the Senate hearings, *supra*, at page 568, Senator Reed asked a witness:

Why are you concerned with this duty at all on dental instruments if you only deal in dental supplies?

The witness stated on the next page what "supplies" he dealt in:

We manufacture material like temporary stopping and base plates, gutta perchas, molding compounds, flasks, and laboratory materials, commercial laboratory materials.

That "instruments" includes "teeth" is a statement equally devoid of support. In *United States* v. *Kimball Dental Mfg. Co.*, 19 CCPA 353, 359, T.D. 45501, the court says that its holding therein is not to be construed as intimating that this summary controls the classification of items therein mentioned.

It should also be borne in mind that paragraph 359, like its predecessor in the 1922 Act, embodied until 1953 a proviso reading as follows:

\* \* \* *Provided,* That all articles specified in this paragraph, when imported, shall have the name of the maker or purchaser and beneath the same the name of the country of origin die sunk conspicuously and indelibly on the outside, or if a jointed instrument on the outside when closed.

There was not statutory escape hatch for instances where the requirement was unreasonable, as in the general marking provision, section 304, Tariff Act of 1930. The Treasury, interpreting the 1922 Act, had nevertheless held, on the ground the law "did not require the impossible," that dental burrs having space available for marking of under ¾ inch need not be individually marked, T.D. 40421, 46 Treas. Dec. 243 (1924). The Customs Regulations from 1922 on never so provided. Nothing in the legislative history of the 1930 Act indicates that this practice was called to the attention of Congress. The Customs Simplification Act of 1953, 67 Stat. 509, repealed the proviso. Still it may throw light on what sort of things the Congress in 1930 thought it had covered. There is no mention in the legislative history of any incongruity being perceived among the articles to which the proviso might apply. There were witnesses who disliked the tariff on surgical and dental instruments and if the proviso produced any absurd results, or if it was really prohibitive of any class of imports, they would no doubt have been glad to point it out. None did. It is a reasonable inference that they thought paragraph 359 applied only to articles that could bear the prescribed marking without interference with their intended function.

Plaintiff relies on the inclusion of "burrs" in the trade agreement. These are articles which are used with well-known dental instruments. *United States* v. *Kimball Dental Manufacturing Co.,* 18 CCPA 289, T.D. 44502. In that case, it was held that dental burrs used by dentists only in conjunction with an electrically-motivated engine or device were classifiable as dental instruments. The court said that paragraph 359—

\* \* \* was intended to apply to the tools which the dentist uses in his operative work and which are exclusively used by that profession [p. 291].

Definitions of the word "instrument" were quoted and it was held that nothing in them prevented the classification of burrs as dental instruments, nor did the fact that they were used with a dental machine instead of by hand. The court added (p. 292):

In saying what we have said, we have in mind that there may be, and probably are, articles used by the dentist in the practice of his

profession which would not properly respond to the definition of instruments.

In *United States* v. *Kimball Dental Mfg. Co.*, *supra*, it was held that metal articles referred to as "articulators" used in the process of making false teeth were dental instruments. The Government's contention that "dental instruments" included only instruments used to operate on the human organism was not sustained. The court held that the term "including" in paragraph 359 was not a word of limitation but one of extension and was used not to exclude dental instruments not named *eo nomine* but to make sure of the inclusion of the items named specifically.

While these cases indicate that paragraph 359 is not to be construed narrowly, they are otherwise not very helpful since the articles involved were obviously "instruments" or parts of "instruments," whereas the articles now before us are quite different.

Both sides rely on *Castelazo & Associates and Surgident, Ltd.* v. *United States*, 47 Cust. Ct. 365, Abstract 66211, and say it is important. For this reason, we set it out at greater length than we think its relevance here justifies. The merchandise consisted of preformed protective crowns for anterior teeth composed of a synthetic resin material, polystyrene. They were used to protect teeth which had been ground in preparation for the fitting of a permanent crown. They were classified by similitude in use to cellulose acetate articles under paragraph 31(a)(2) of the Tariff Act of 1930, as modified, and were claimed to be dutiable under paragraph 1558, as modified, as nonenumerated manufactured articles. No claim was made for classification directly or by similitude under paragraph 359. The witnesses made a distinction in use between the preformed crowns in question and (1) a cellulose acetate item which is filled with plastic material, pressed on a prepared tooth until the material hardens, after which the matrix is peeled off; (2) a steel crown used to protect baby teeth, and (3) an aluminum crown for posterior teeth. The court held that the preformed protective crowns in issue were not similar in use to the cellulose acetate articles, stating (p. 368) :

> The polystyrene, preformed crowns involved herein are finished products, ready for dental use. They are new dental appliances, specifically made to be used as temporary crowns on anterior teeth with which they are exclusively employed. When one of these temporary crowns is fitted to the prepared tooth that it is designed to protect, it remains in place until the permanent crown is ready to be placed in position. The cellulose acetate matrixes referred to in the testimony of the witnesses are merely containers to hold a plastic substance, formed by a dentist, to a prepared tooth until the temporary crown is set, at which time, the cellulose matrix is peeled off, leaving a plastic temporary crown. There is a substantial difference in use between the preformed crowns in question and the cellulose acetate

matrixes discussed by the witnesses. The imported articles under consideration are, of themselves, temporary crowns; the cellulose acetate matrixes mentioned herein are coverings or retainers that serve to facilitate the formation of temporary plastic crowns.

Plaintiff relies particularly on the court's reference to the temporary crowns as "dental appliances." However, the term "appliance" is broader than the term "instrument." Since as we have made plain already, "instrument" does not mean the same thing as "equipment" or "supplies," if it meant the same thing as "appliance," that would have to be shown. It is reasonable to suppose that the then Chief Judge Oliver selected his words with care and chose to write the relatively neutral word "appliance" rather than the word "instrument," which had tariff significance, for the very purpose of avoiding the adjudication of issues not before him.

Defendant derives support from *Castelazo*, if we understand it, in (a) that the articles in that litigation were not directly enumerated, (b) that they were held not properly classed by similitude under paragraph 31(a)(2) because not similar as to use to articles classed under that paragraph, (c) still they were not classed by similitude under paragraph 359 though they were identical as to use with metal shells and crowns, and (d) therefore, Q.E.D., metal shells and crowns do not belong under paragraph 359 either. We do not think the omission to classify an article by similitude can be used in this fashion as authority respecting the direct classification of the article to which it is similar. There are too many assumptions. The opinion, in its closing portion, seems to deal with paragraph 359 and any other possible similitude claims and to turn on the omission of either side to claim under other paragraphs and of the Government to go forward and establish their applicability. We think we must find our way to a correct result without help from *Castelazo*.

The plaintiff's testimony falls short of showing that "dental instrument" in the terminology of the dental profession or the trade in dentist's appliances includes crowns and shells today. Both witnesses seem to have been unfamiliar with such a usage until they prepared themselves to testify. Nor was there even any attempt to show that the term had that meaning in 1930.

Here, as in *United States* v. *A. J. Taylor of Santa Fe, New Mexico*, 48 CCPA 97, C.A.D. 772, we are confronted with a definition in a summary of tariff information which is so carelessly phrased as to be useless as a guide to the court. There the court went to trade testimony to determine this. Here testimony is not needed because other legislative history so establishes. About all else we can derive from that legislative history, however, is that not everything a dentist uses in dentistry is a "dental instrument." The words "dental equipment"

and "dental supplies" denote things not necessarily instruments. The caveat in the *Kimball* case, quoted, *supra*, is to the same effect.

Our own perception of common speech limits the word "instruments" in this context to devices used by the dentist in different ways than the merchandise at bar. This is reinforced by the proviso which existed in paragraph 359 up to 1953, under which *all* imported dental instruments had to be conspicuously and indelibly die-stamped on the outside as specified above. It seems incredible that the Congress could have intended this requirement to apply to an article to be lodged, perhaps, for months, on a person's tooth, where any irregularity or imperfection of fit would have adverse consequences. But it did so intend if it intended the involved articles to be classed under paragraph 359. The conclusion is it expected them to be classed elsewhere. (That the Treasury had allowed an exception in a decision not called to the attention of Congress does not destroy this argument though it does weaken it somewhat.) The caps and crowns are not instruments, but articles put in place and removed with the use of instruments.

In view of the Government's concessions, the copper bands are held dutiable at 17½ per centum ad valorem under paragraph 359 of the Tariff Act of 1930, as modified, under the provision for dental instruments. The aluminum shells and crowns are held properly dutiable, as assessed, at 19 per centum ad valorem under paragraph 397 of said tariff act, as modified.

The protests are sustained as to the copper bands and overruled as to all other merchandise. Judgment will be rendered accordingly.